UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:18-cv-00061-GFVT-EBA |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| KENTUCKY STATE UNIVERSITY, | ) | **ORDER** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on Defendants' Motion for Summary Judgment [R. 33.]
In November 2018, Plaintiff John Doe filed suit against Kentucky State University, KSU
President Christopher Brown, Brandon Williams, and Justin Mathis.  [R. 1.]  In his Complaint,
Mr. Doe alleges that two employees of KSU sexually harassed him in violation of Title IX and
that the response of KSU and its employees was insufficient.  *Id.*  Defendants move for summary
judgment in response.  [R. 33.]  The Court, having reviewed the record and for the reasons set
forth herein, will **GRANT** Defendants' Motion for Summary Judgment [R. 33.]

**I**

In the fall of 2017, Doe was a junior at KSU.  [R. 33 at 1.]  During September of that
year, Doe alleges that he was sexually harassed by two different employees of the University.
First, Doe alleges that, while using the dating app Jack'd, which does not require verification of
identity to sign up, he connected with an individual who indicated they were a KSU professor.
[R. 33 at 2.]  Doe contends that, upon learning the user was a professor, he insisted that he "no
longer wished to receive messages from [the professor]."  *Id.*  Nonetheless, Doe alleges that the

user persisted, sent a photograph of his genitals, and "allegedly sent a separate picture" of his face.[1]  *Id.*

On September 8, Doe sent an email detailing his concerns about "inappropriate communication from a professor" to KSU President M. Christopher Brown II.  *Id.*  President Brown's office then relayed Doe's concerns to Joseph Goodman, the Director of Student Support Services.  *Id.*  After speaking with Doe, Goodman was informed that "Doe did not know the professor's name, nor had he ever had any classes with the professor, or even any interaction with the professor on or off campus outside of the Jack'd app."  *Id.* at 2-3.  Because Doe had a headshot photograph sent by the user, however, the identity of the person pictured was uncovered by KSU staff.  *Id.*  When informed of the allegations against him, the professor "denied having been on any online dating site," indicated that he did not know Doe, and that Doe had never been one of his students.  *Id.*  Regardless, the Chairperson over the professor ordered him to "cease all communication, and to have no further contact with Doe."  *Id.*  Upon being informed of the no contact order, Doe indicated that he was "very satisfied at the urgency [KSU] [had] shown these matters…."  And, consequently, KSU contends that it "understood that the matter had been resolved to Doe's satisfaction."  *Id.*  Further, at his deposition, Doe indicated that "he never received any more messages or other contact from that individual, either through the Jack'd app or otherwise."  *Id.* at 4.

Doe contends he was sexually harassed a second time in late September.  [R. 39 at 2.]  Alongside his classwork, Doe worked in the KSU admissions office, where he "provided campus tours to prospective students."  *Id.* at 1.  As part of his job, Doe "was selected to attend a

---

[1] KSU's Title IX Investigative Report on this incident found that, while the nude picture was marked with the Jack'd logo, the headshot was not.  [*See* R. 35, Exhibit 1 at 15.]

recruiting event in Washington, D.C.," and was to travel with Justin Mathis, then a KSU Vice President and Director of Admissions. *Id.* at 2. Upon arrival to their hotel, Doe alleges that Mr. Mathis "cancelled" the second room, and, instead, insisted that both he and Doe "share a single room with two beds." *Id.* at 4. Although Doe was uncomfortable with this arrangement, he contends that he had no way to obtain an additional room and ultimately relented. *Id.* Soon after entering the shared room, Doe alleges that Mr. Mathis "opened the bathroom door and came into the room completely naked and putting lotion on his body." [R. 39 at 2.] Although Doe states that he tried to ignore the behavior, he alleges that Mr. Mathis responded by texting him that he was "horny" and requested Doe get into bed with him. *Id.* at 3. And, though Doe contends that he immediately blocked Mr. Mathis's number, he states that Mr. Mathis continued sending him sexual messages through social media. *Id.* During this time, Doe states that he "sought assistance from two separate KSU employees," including Mr. Mathis's administrative assistant and an admissions counselor, to no avail. *Id.* Finally, Doe alleges that he messaged another individual with no connection to KSU, and that individual "sent Mathis an online message telling him to get Doe a separate room or the individual would report [him]." [R. 33 at 4.]

The next morning, Mr. Mathis "acquired a separate room for Doe for the remainder of the trip." *Id.* But because Mr. Mathis was a payor on the second room, Doe alleges that he "was able to retain a keycard and access [Doe's] hotel room." [R. 39 at 3.] Consequently, later that same night, after Doe invited two acquaintances to his room, Doe alleges that Mr. Mathis entered his room without knocking, asked the acquaintances "why wasn't I invited?," got on his knees, and "attempted to give oral sex" to one of them. *Id.* at 4. Doe states that, in response, Mr. Mathis was rebuffed by the acquaintances and was asked to leave the room. *Id.*

After returning from the trip, Doe contends that he informed another KSU employee and

student counselor, as well as Mr. Goodman, who had assisted him during the professor incident earlier in the month, about Mr. Mathis's behavior. *Id.* Although these conversations are not described in specificity, Doe "acknowledges that some or all of them directed him to speak with KSU's General Counsel Lisa Lang to report the conduct," an action that he did not undertake. [R. 33 at 6.] Additionally, Doe contends that he "dropped off a letter [detailing Mr. Mathis's alleged conduct] to Ms. Smoot KSU's Human Resources Director and the director supervisor of Title VII Coordinator Brandon Williams" sometime prior to February 27, 2018. [R. 39 at 3.] Nonetheless, despite his reports to various KSU employees, Doe contends no action was taken on his report of Mr. Mathis's behavior until February 27, 2018, when his mother sent an email to President Brown. [R. 39 at 5.]

In her email, Doe's mother expressed her concerns about the alleged sexual harassment her son had faced and requested the President act on the matter. [R. 35 at 17.] Upon receipt of the email, President Brown "forwarded her email to KSU's Title IX coordinator, Brandon Williams." [R. 33 at 6.] On March 1, 2018, Mr. Williams met with Doe, performed an interview, and "opened an investigation into both alleged incidents." *Id.* at 7. Moreover, "[b]oth the professor and Mathis were placed on administrative leave during the formal investigation that was being conducted by Williams." *Id.* Included in both the professor and Mr. Mathis's notices of administrative leave were strict instructions to not be on campus or any other KSU property, to not attend any KSU event, and to turn in [their] KSU keys and laptops. [R. 35 at 124, 126.] Four days later, Mr. Mathis "resigned from his position as Director of Admissions at KSU." [R. 33 at 7; R. 35 at 128.] Because Mr. Mathis was no longer employed by KSU, Mr. Williams, citing a lack of jurisdiction, administratively closed the Title IX complaint filed against him. [R. 35 at 130-131.] Conversely, Mr. Williams "continued to reinvestigate the incident involving the

4

professor." [R. 33 at 7.] After interviewing Doe and the professor, and then interviewing Mr. Goodman and another faculty member "about the steps KSU had previously taken to address Doe's concerns, including the no-contact order," Mr. Williams "issued an investigative report, which determined that there was insufficient evidence to support a finding that the professor violated KSU's sexual harassment policy." *Id.*

After the conclusion of the investigations, and because the administrative leave order did not bind Mr. Mathis post-resignation, Doe contends that Mr. Mathis continued to appear on campus and "continued to have contact with [him]." [R. 39 at 5.] Specifically, Doe alleges that Mr. Mathis frequented the admissions office, where Doe worked, and made comments insinuating that he should leave or someone would "tell on him," a statement impliedly aimed at Doe. *Id.* Additionally, Doe alleges that "[o]n another occasion, Mr. Mathis and President Brown commented [...] on the size of his butt and thighs." *Id.* Doe, however, could not recall many specific details about the time period in which the comment was allegedly made. *Id.* Now, arguing KSU insufficiently investigated his claims of sexual harassment, Doe brings Title IX claims, negligence claims, and a breach of contract claim against Defendants. In opposition, Defendants move for summary judgment. All briefing having been submitted, this matter is now ripe for review.

## II

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a

verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

Before turning to the Parties' dispositive arguments, the Court must clarify the remaining pending counts in this matter. During the pendency of this litigation, the drafting of Plaintiff's Complaint has led to confusion. In his Complaint, Plaintiff indicates, by bold and underlined caption, that Counts 1 and 2 are counts filed against KSU. [*See* R. 1 at 7, 9.] Similarly, by bold and underlined caption, Plaintiff's Complaint indicates that Counts 3, 4, and 5, are counts filed

against "KSU, Brown, Williams, and Mathis." *See id.* at 11-13.  Apparently unclear as to which counts Mr. Mathis was sued under, however, Mr. Mathis's counsel filed a Motion to Dismiss in June 2019 which indicated "the only count against Defendant, Justin Mathis, in his individual capacity, is the state law negligence claim under Count 3." [R. 14 at 1-2.]  In response, Plaintiff did not oppose Mr. Mathis's stated construal of his Complaint, but instead, simply opposed dismissal of the negligence claim. [*See* R. 16.]  And when Mr. Mathis was later granted dismissal under Count 3 and was subsequently terminated from this action in his individual capacity, Plaintiff filed nothing in the Record indicating his opposition.  [R. 22.]

In June 2021, however, the remaining Defendants in this matter filed a Motion for Summary Judgment that construed several claims as still pending against Mr. Mathis in his individual capacity, despite his termination from this matter two years prior.  [*See* R. 33 at 10.]  In response, the Court ordered Plaintiff to clarify his Complaint.  [R. 41.]  In his clarification status report, however, Plaintiff, for the first time, indicated that Counts 1 and 2 were intended to have been counts filed against every Defendant, not just KSU.  [R. 42 at 2.]  Similarly, Plaintiff clarified that Count 3 remains pending against every Defendant aside from Mr. Mathis, Count 4 remains pending against KSU, Brown, and Williams, and Count 5 remains pending only against KSU.  *See id.*  Because this reading of the Complaint differed from the Court's own reading and the reading of the remaining Defendants in this matter, the Court conducted a status hearing.  [R. 43.]  Adding to the confusion, at the status hearing, Plaintiff indicated that, despite his status report, all of his claims against Mr. Mathis in his individual capacity had been resolved, but that the remaining construal of his Complaint, as provided in his status report [R. 42] was correct.[2]

---

[2] The Court notes that Doe's current counsel is not the same counselor who drafted the Complaint.  Consequently, it appears Doe's current counsel wishes the Court to construe the Complaint like he would have drafted it had he been original counsel.  Though the Court agrees

Defendants oppose this construal and ask the Court to rule that their reading of the Complaint is correct.

Under Federal Rule of Civil Procedure 8(e), the Court must construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e). Upon review of the Complaint and Parties' arguments, the Court finds justice requires a determination that Mr. Mathis, in his individual capacity, was properly terminated from this matter in 2019. Additionally, the Court holds that, despite Plaintiff's current reading of his Complaint, justice requires a holding that the characterization of the remaining claims as found in Defendants' Motion for Summary Judgment is correct.[3] Though the Court sympathizes with the position of Plaintiffs' current counsel, this litigation has been pending for over three years. To now ask the Court to read the Complaint in a manner that may require additional discovery and the filing of new dispositive motions by each party would not serve the ends of justice. Accordingly, the Court finds that Counts 1 and 2 remain pending only against KSU, while Counts 3, 4, and 5 remain pending against KSU, President Brown in both his individual and official capacity, Mr. Williams in both his individual and official capacity, and against Mr. Mathis in his official capacity only.

**B**

Having clarified the pending counts in this matter, the Court turns to Defendants' request for summary judgment. In his Complaint, Doe first alleges that KSU violated Title IX because its responses to his allegations of sexual harassment were clearly unreasonable. [R. 1 at 7-9.] Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from

---

Doe's current counsel's proposed construal makes logical sense when the merits of each claim are analyzed, the Court declines to alter the Complaint in Doe's favor simply because counsel seemingly has a better grasp on the viability of Doe's claims than his predecessor.
[3] Aside from the characterization that claims remain pending against Mr. Mathis in his individual capacity.

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).  When a University accepts federal funding, it must comply with the requirements of Title IX.  And a University's compliance with Title IX is "enforceable [by individual plaintiffs] through an implied private right of action."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (citing *cannon v. University of Chicago*, 331 U.S. 677 (1979).

To be held liable for its response to a complaint of sexual harassment, the University must have been "deliberately indifferent to sexual harassment, of which they [had] actual notice, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999).  That is, a University's actions must establish "an official decision [...] not to remedy the violation."  *Gebser*, 524 U.S. at 290.  And, for a response to be deemed deliberately indifferent, the response must be deemed "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  Additionally, to establish causation under a Title XI deliberate indifference claim, a plaintiff must prove that he was subjected to further post-actual-knowledge harassment which would not have occurred but for a University's deliberate indifference.  *Kollaritsch v. Mich. State. Univ. Bd. of Trs.*, 944 F.3d 613, 623-24 (6th Cir. 2019).

In their Motion, Defendants argue that Doe's Title IX deliberate indifference claim fail because the University's responses were not clearly unreasonable and because Doe did not suffer any post-actual-notice sexual harassment.  [R. 33 at 11-20.]  In support of their contention that the University's actions were not clearly unreasonable, Defendants focus on the University's response to Doe's allegations against Mr. Mathis and argue that, upon receipt of the email from

Doe's mother, President Brown immediately referred the matter to Mr. Williams. *Id.* at 19. And

because Mr. Williams quickly gave Doe and his mother information about the Title IX process

and started an investigation, and KSU "placed both the professor and Mathis on administrative

leave to avoid any risk of additional harassment during the course of the investigation,"

Defendants argue their response was not clearly unreasonable. *Id.* (citing *Stiles v. Grainger*

*City*, 819 F.3d 834, 849 (6th Cir. 2016) (holding that taking "proactive steps to reduce

opportunities for future harassment" indicates a lack of deliberate indifference).[4]

In addition, Defendants contend that Doe did not experience any further sexual

harassment after the University was put on actual notice of his allegations. In support,

Defendants argue that the University received actual notice of Doe's alleged sexual harassment

by the professor on September 8, 2017, when Doe sent his letter to President Brown. [R. 33 at

12.] And, after receiving actual notice, Defendants argue that no further sexual harassment

occurred because the University issued a no-contact order between the professor and Doe, which

Doe indicated was not violated. *Id.* at 13. Next, Defendants argue that Doe did not suffer any

post-actual-knowledge harassment by Mr. Mathis. *Id.* at 14-18. But, unlike Doe's quick report

of the alleged actions of the professor, the University alleges it did not receive actual notice of

Mr. Mathis's conduct until February 2018 when Doe's mother emailed to President Brown. *Id.*

And, though Mr. Mathis allegedly made snide comments aimed at Doe after his resignation from

KSU, Defendants argue the comments do not equate to sexual harassment. *Id.* at 16-18.

In response, Doe first argues that Defendants "applied incorrect Supreme Court

precedent" and that the Supreme Court in *Davis* actually established that "the standards for

---

[4] Defendants do not analyze whether the University's initial response to Doe's complaint against
the professor was reasonable and, instead, only argue no post-actual-knowledge harassment
occurred from the professor.

establishing institutional liability for peer harassment [is] far more rigorous than the standards for establishing liability when the perpetrator is an employee, teacher, or dean of admissions." [R. 39 at 6 (citing *Davis*, 526 U.S. at 653).]  Though Doe does not explain the alleged difference in standards, the Court surmises him to argue that employee-on-student harassment, in the Title IX context, does not require a showing of "clearly unreasonable" behavior on behalf of the University to show deliberate indifference, but, instead, requires some lesser showing.  [*See* R. 39 at 6-7.]  And in further support of his contention, Doe argues "no meaningful investigation was ever completed by Defendants" because "the matter was closed only nine days after receipt of the report with absolutely no finding as to whether the sexual harassment occurred […]."  *Id.* at 8.  Additionally, Doe argues that the closing of his complaint against Mr. Mathis upon his resignation violated "KSU's own policies and procedures," as well as Title IX.  *Id.*

Regarding post-actual-notice harassment, Doe argues that the University was on actual notice prior to February 2018 because he reported Mr. Mathis's actions to two employees of the KSU Admissions Office while on the Washington, D.C. trip, informed Mr. Goodman, who handled his sexual harassment complaint against the professor, and "dropped off a letter to Ms. Smoot, KSU's Human Resources Director" and supervisor of Mr. Williams, the Title IX Coordinator, prior to February 2018.  [R. 39 at 4.]  Moreover, Doe contends that, as a Vice President of KSU, Mr. Mathis himself was an employee whose own actions permitted the University to be on actual notice of his conduct.[5]  [R. 39 at 7-8.]  Finally, Doe alleges that another incident of sexual harassment occurred post-actual-notice when, on another unidentified occasion, Mr. Mathis and President Brown "commented directly to Mr. Doe about the size of his

---

[5] Doe's Response only focuses on the actions of the University regarding Doe's complaint against Mr. Mathis.  Doe in no way responds to Defendants' argument that he experienced no post-actual-notice harassment from the professor.  [*See* R. 39 at 6-9.]

butt and thighs."[6] *Id.* at 5.

In reply, Defendants first cite *Williams v. Paint Valley Local Sch. Dist.*, in which the Sixth Circuit explicitly rejected Doe's contention that the clearly unreasonable standard does not apply in cases in which employee-on-student harassment is present. [R. 40 at 4-5 (citing 400 F.3d 360, 367 (6th Cir. 2005) ("It is clear from a reading of *Gebser* and *Davis*, that the Court is discussing only one standard for 'deliberate indifference' in Title IX pupil harassment cases and not, as Williams contends, one standard for student-on-student harassment and a less stringer standard for teacher-on-student harassment.")).] Accordingly, Defendants ask the Court to apply the clearly unreasonable standard in determining whether the University was deliberately indifferent to Doe's Title IX allegations.

Next, Defendants argue that no person was an "appropriate person" under Title IX to have put KSU on actual notice of Mr. Mathis's actions prior to President Brown's receipt of Doe's mother's email. And that, even if one of the employees Doe references was an "appropriate person," Mr. Mathis's comments allegedly made at Doe's place of employment do not constitute additional sexual harassment. [R. 40 at 4-6, 8.]

Upon review, the Court agrees with Defendants. First, the standard to determine whether a University's response was clearly unreasonable does not differ between peer-on-peer and employee-on-student cases. *See Williams*, 400 F.3d at 367. Second, the Court agrees with Defendants that the University's response to Doe's report of sexual harassment against Mr.

---

[6] Though Plaintiff's Response is not clear, the Court surmises Doe to argue that this comment was made after he dropped off a letter to the Human Resources Department, but before President Brown referred his complaint to KSU's Title XI office and Mr. Mathis resigned from his job. [*See* R. 39 at 5.] But, when asked for details about this incident, Doe was unable to recall when the comment was made, if the comment occurred before or after the Washington, D.C., trip, or even what season it was when the comment was made. [R. 35 at 53-54.]

Mathis was not deliberately indifferent because, in direct contention with "an official decision […] not to remedy the violation," the University immediately reported Mr. Mathis's conduct to its Title IX office, and the office immediately placed Mr. Mathis on leave and began an investigation into his conduct. [R. 33 at 11-20; *Gebser*, 524 U.S. at 290.]  Furthermore, though Doe contends that the University's response was insufficient because it dismissed the complaint against Mr. Mathis upon his resignation, federal regulations, as of May 2020, permit the dismissal of a formal complaint "if at any time during the investigation or hearing […] the [accused] is no longer enrolled or employed by the [University]."  34 C.F.R. 106.45(B)(3)(ii). Because the parties do not reference any regulation that governed proper dismissal procedure prior to May 2020, the Court finds the later-promulgated regulation to be persuasive evidence that the University's dismissal of Doe's complaint in 2018 was not clearly unreasonable. Consequently, because the University responded promptly, initiated proper action, and only dismissed Doe's complaint upon Mr. Mathis's resignation from KSU, its conduct was not deliberately indifferent in violation of Title IX.

Next, the Court agrees with Defendants that Doe's Title IX deliberate indifference claim against the University regarding its response to his allegations against the professor is not viable because Doe was not sexually harassed by the professor after the University received actual knowledge of his alleged harassing actions.  At deposition, Doe indicated that, upon informing the University of his complaint against the professor, "he never received any more messages or other contact from [the professor], either through the Jack'd app or otherwise."  [R. 33 at 3-4.] Accordingly, because no further sexual harassment occurred, the record does not support a finding of causation between the University's response and Doe's alleged harm.  Consequently, though Doe does not thoroughly litigate whether the University's response to his allegations

13

against the professor was clearly unreasonable, Defendants are still entitled to summary judgment because Doe fails to demonstrate that he experienced post-actual-knowledge sexual harassment from the professor.

Accordingly, because Doe fails to establish that the University's response to his report of Mr. Mathis's conduct was deliberately indifferent, and because he experienced no post-actual-knowledge sexual harassment from the professor upon the University's receipt of actual knowledge, his Title IX deliberate indifference claim against KSU is **DISMISSED**.

## C

Next, Defendants seek summary judgment against Doe's hostile educational environment claim.  [R. 33 at 20-21.]  "A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim."  *Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citing *Clairborne Cty.*, 103 F.3d 495, 515 (6th Cir. 1996).  Under a hostile educational environment theory of liability, "the plaintiff must allege that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of [his] educational environment."  *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

In the Sixth Circuit, "the elements to state a supervisory hostile environment claim under Title VII apply equally under Title IX."  *Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 514 (6th Cir. 1996).  To determine whether conduct is severe or pervasive, the Supreme Court has provided courts a non-exhaustive list of factors to consider, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with a [student's] performance."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d. 400, 411 (6th Cir. 2021) (citing *Harris*, 510 U.S. at 21).

14

And, "[w]hether the Defendant's alleged conduct rises to a level sufficient to create a hostile environment is a legal question that may be addressed on summary judgment." *Klemencic v. Ohio State Univ.*, 10 F.Supp.2d 911, 916 (S.D. Oh. July 15, 1998) (citing *Blakenship v. Parke Care Centers, Inc.*, 913 F. Supp. 1045, 1051 (S.D. Oh. 1995) (*aff'd*, 123 F.3d 868 6th Cir. 1997).

In his Complaint, Doe alleges that KSU allowed its campus to become "a sexually hostile environment where [Doe's] perpetrator roamed free and could turn up at any moment." [R. 1 at 10.] And, as a result of KSU's alleged deliberate indifference to his allegations of sexual harassment, Doe contends that he is owed damages for delay caused in pursuing his higher education, and "for fear, anxiety, trauma, and emotional distress." *Id.* In pursuit of summary judgment, Defendants contend that "Doe does not allege facts that support a reasonable inference that his educational experience" was hostile or that a pervasive pattern of conduct altered his educational environment. [R. 33 at 20-21.] Doe's response does not address Defendants' argument. [*See* R. 39.]

Upon review, the Court agrees that dismissal is appropriate because Doe has failed to establish a pervasive pattern of conduct which could have altered the conditions of his educational environment. Though the Court agrees that the alleged conduct of the professor and Mr. Mathis were inappropriate, particularly due to the aggressive nature of Mr. Mathis's alleged conduct which allegedly occurred near an isolated Doe, Doe does not describe a pattern of inappropriate conduct in this matter. Instead, Doe describes two unrelated incidents of sexual harassment which were resolved by University action. [*See* R. 39.] Though both the alleged conduct of the professor and Mr. Mathis was unprofessional, inappropriate, and harmful, the actions did not turn Doe's educational experience hostile. Though the Court recognizes the frequency of conduct to be only one factor it must weigh when determining whether hostile and

15

pervasive conduct is present, the Court finds this factor, in the context of this case, simply outweighs the remaining factors.  Accordingly, the Court will **DISMISS** Count 2.

### D

The Court next turns to Defendants' argument that Doe's state law claims are barred by sovereign and qualified official immunity.  [R. 33 at 21-24.]  In his Complaint, Doe brings claims of negligence, negligent hiring, training, and supervision, and breach of contract against KSU, Brown, and Williams, and Mathis, in both their official and individual capacities.[7] [R. 1 at 11-14.]  In response, Defendants argue that KSU and each Defendant in their official capacities are shielded from liability by sovereign immunity.  [R. 33 at 22.]  Similarly, Defendants argue each claim against each Defendant in their individual capacities are barred by qualified immunity.  *Id.* at 23.  Finally, alongside the bar to liability presented by qualified immunity, Defendants argue that Doe's breach of contract claim against Williams and Brown fails because neither contracted with Doe.  *Id.* at 23-24.

When assessing whether defendants are entitled to immunity from state law tort liability, the Court must apply Kentucky rules of sovereign immunity.  *See Funke v. Coogle,* 2013 U.S. Dist. LEXIS 7189 (W.D. Ky 2013) (citing *King v. Taylor,* 694 F.3d 650, 662-64 (6th Cir. 2012)). And in Kentucky, the state is immune from suit unless it "has given its consent or otherwise waived its immunity."  *Yanero*, 65 S.W.3d at 517.  The Supreme Court of Kentucky has stated that it will find "waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'"  *Withers v. University of Kentucky*, 939 S.W.2d 340, 346 (Ky. 1997).  Moreover,

---

[7] As previously noted, all claims against Mr. Mathis in his individual capacity have been resolved.

as an agency of the Commonwealth of Kentucky, universities enjoy sovereign immunity under the Eleventh Amendment. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984). Similarly, "an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Ky v. Graham*, 473 U.S. 159, 166 (1985).

Additionally, Kentucky provides qualified immunity to "public officers and employees for "(1) discretionary acts or functions . . . ; (2) [exercised] in good faith; and (3) within the scope of the employee's authority." *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero* 65 S.W.3d at 522)). The plaintiff bears the burden of demonstrating that a public employee acted in bad faith. *Yanero*, 65 SW.3d at 523. To carry this burden, the plaintiff must show that the defendant violated "a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; *or* [that] the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* (internal quotations omitted) (citations omitted). Officials are "not liable for bad guesses in gray areas," and "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (internal quotations omitted) (citations omitted).

First, Defendants argue that sovereign immunity bars Doe's claims against KSU, and Brown, Williams, and Mathis in their official capacities. [R. 33 at 22.] In support, Defendants argue that the state has not consented to suit or waived its immunity against Doe's claims of negligence, negligent hiring, training, and supervision, and breach of contract. [R. 33 at 22.] And, similarly, Defendants argue that qualified immunity protects Brown and Williams in their individual capacities because their "efforts in responding to Doe's complaints were

17

discretionary" and because "the hiring and supervision of employees is an inherently discretionary function." *Id.* at 23. In further support, Defendants argue that Doe's breach of contract claim against Brown and Williams fails because neither Brown nor Williams contracted with Doe. *Id.* at 23-24.

In response, Doe argues that both sovereign and qualified immunity have been impliedly waived by Kentucky in sexual harassment cases. [*See* R. 39 at 9-10.] In support, Doe cites to *Department of Corrections v. Furr*, 23 S.W.3d 615 (Ky. 2000). In *Furr,* the Kentucky Supreme Court found that the Commonwealth had waived its sovereign immunity protection to claims brough under the Kentucky Civil Rights Act. *See id.* at 617. To reach this conclusion, however, the Court analyzed the exact language of the KCRA to determine whether immunity had been waived. *See id.* (quoting *Withers*, 939 S.W.2d at 346 ("[w]e will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.")). Despite the Supreme Court's narrow ruling, Doe argues that "[b]y implication, the Commonwealth has waived immunity and the state law claims should proceed." [R. 39 at 10.]

In reply, Defendants argue that Doe's characterization of the impact of Kentucky's waiver of sovereign immunity in the KCRA context is too broad and that the waiver "does not extend to claims not brought under the KCRA, let alone [] the type of common-law negligence claims Plaintiff asserts." [R. 40 at 10.] Defendants are correct. To interpret the Supreme Court's holding in *Furr* as mandating a waiver of of sovereign immunity in common-law negligence and contract claims would, as Defendants state, "be a sea-change in Kentucky law." [R. 40 at 11.] And, moreover, Doe simply cites no case law which indicates a massive expansion of the waiver of sovereign immunity to be appropriate. Accordingly, the Court **DISMISSES**

18

Doe's common-law claims against KSU, and Brown, Williams, and Mathis in their official capacities.[8]

Additionally, the Court agrees with Defendants that Doe's common law claims of negligence and negligent hiring, training, and supervision against Brown and Williams in their individual capacities are barred by qualified immunity.[9]  *See Doe v. Logan*, 602 S.W.3d 177, 188 (finding a teacher's decision to not report potential sexual harassment to constitute a discretionary function); *see also Doe v. Patton*, 381 F.Supp.2d 595, 607 (E.D. Ky. 2005) (finding a decision to not perform a background check to be a discretionary function preventing liability for plaintiff's negligent hiring claim).  Moreover, the Court agrees that Doe's breach of contract claim against Brown and Williams in their individual capacities must be dismissed because Doe presents no evidence that Brown or Williams contracted with him.  *See Dore & Assocs. Contr. v. City of Columbus*, 726 Fed. Appx. 997, 1006 (6th Cir. 2018) ("the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange") (citing RESTATEMENT (SECOND) OF CONTRACTS § 17(1)).  Accordingly, the Court **DISMISSES** each common law claim against each Defendant in this matter.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment [R. 33] is **GRANTED**.  The case will be **STRICKEN** from the record, and an appropriate judgment will be entered contemporaneously

---

[8] The Court notes that per KRS § 45A.245, a breach of contract claim can be brought against the Commonwealth if the contract is written, and the action is filed in Franklin Circuit Court.  *See* KRS § 45A.245.  But, in this matter, Doe references no written contract and did not file this matter in Franklin Circuit Court.

[9] Though case law supports this finding, the Court also notes that Doe failed to oppose Defendants' qualified immunity argument in his response.  [*See* R. 39.]

herewith.

This the 13th day of December, 2021.

Gregory F. Van Tatenhove
United States District Judge